The next case on the docket is Sarabeth Witbar v. Mandara Spa. And David Brill is here for Appellant Witbar. Aleda Milkey is here for Appellant Mandara. And Mr. Brill, you may proceed with your argument. Well, thank you very much, Judge Wilson. May it please the court. As this honorable court is aware, we assert that the district court committed four errors in exonerating Mandara on its affirmative defense under McCorpin. Given the time permitted, I'll rest on our briefs regarding the failure of the district court to consider that the defense was a verboten after-the-fact pretense and address the remaining three. First, it's manifest that the district court misanalyzed the three prongs of the McCorpin concealment defense for Sarabeth's 2013 pre-employment medical exam, or PEME. As we briefed, the McCorpin concealment defense is one of two McCorpin defenses, and it applies to pre-employment exams, or PEMEs, or interviews. The second McCorpin defense is the nondisclosure defense, and it applies to post-employment exams, interviews, or settings. I want to emphasize next, please, a few of the many reasons we briefed why the district court misanalyzed prong one of the concealment defense relative to that 2013 PEME. Sarah, I'm sorry, you're on mute, your honor. I'm sorry. Can I direct your attention to the 2015 evaluation with respect to the nondisclosure and concealment issue? I mean, it seems to me that in any case, when your client did not disclose her visit to Dr. Smigel and her statements that she made during that visit, that she was concerned that she would drop her shears, basically that she really couldn't do her job, that at that point, regardless of whatever may have happened before, she had a chance to disclose. And by not disclosing that, that then made the McCorpin defense in any situation relevant, even if we don't consider what happened before that. Why is that not the case? Very simply. Firstly, your honor's question impliedly indicates, and I submit respectfully, correctly, that the concealment defense is indeed the defense that court below should have applied relative to that 2015 biannual because it was a post-employment examination. I'm just saying, even assuming that the concealment... Understood. Right. Okay. Well, there are, as your honor knows, there are two prongs to that concealment, or excuse me, failure to disclose defense. We briefed in many ways how the first of those prongs or components was not met, notwithstanding your honor's concern, namely that she could reasonably be expected to have considered the undisclosed medical history not a matter of importance, but the most important... I'm sorry, but why is that, right? Because why wouldn't it be of material importance to her employer that she did not think that she could safely perform her job? Because, and this is a critical fact component, when she sees Smigel, Smigel identifies to her a variety of exercises that she should do, Sarah Beth, when she's working. So implicit in that directive by her doctor in Hawaii is that she is fit to work, because why else are you getting exercises to do in between customers, as I think verbatim the directive from Smigel was, if you're not fit to work? So she, Sarah Beth, is only obligated under the failure to disclose defense to reveal things that she thinks would be material to her ability to work. But I'll go a step further. The bigger reason and the most obvious reason is this, and that's the second component. It is veritably impossible, Your Honor, to conclude that Sarah Beth reasonably thought that she was anything but fit for duty, which is that second necessary problem. Even if, while I refute it, even if Sarah Beth thought it was material, they still, the defense has the burden to prove that she was unreasonable, Sarah Beth, in thinking subjectively she's fit for duty. And that is a veritable impossibility, given that at the biennial and every single visit to the shipboard doctor and her land-based long-standing primary care since childhood, all say over and over and over again, in writing, in deposition, Sarah Beth was wrong. The problem with your argument is that your client, Ms. Woodpark, testified and the court is entitled to make a credibility determination. That, you know, you got an eight-day trial, the judge reviewed hundreds, hundreds of documents and depositions, and it heard from multiple doctors, it heard from Ms. Woodpark herself. You're right that there's conflicting evidence, but isn't the district judge entitled to make and here's why. Firstly, even if his honor is entitled to make credibility determinations, generally speaking, he can only do that applying the correct test, Judge Wilson. If in fact, and it is clear, the one benefit we have to a bench trial is there's no mystery to what tests the fact finder employed, what the findings were with each one, and it is irrefutable that his honor below applied the failure to disclose tests or the concealment test rather than the failure to disclose tests to that 2015 PME and beyond. And so even if we give his honor every benefit of the doubt on credibility, you can't apply the wrong tests. And at that difference is all the difference in the world. And I submit there's no greater piece of evidence for which there is no credibility call than this. Just days before Sarah Beth is disembarked in 2017, January 2017, on the very conditions, the myriad of cervical disease conditions that she had then, just days before when the shipboard doctor is asked by Mandera's representative, is she fit for duty? The shipboard doctor says yes. How could it possibly be then that any point in time from then back, let alone that 2015 PME, that Sarah Beth herself is unreasonable in thinking that when doctor after doctor, including the shipboard doctor, just days before thought that. She's not telling them everything. I mean, so how, I don't know that we can rely on what the and while on that discrete point, your honor, there is no evidence that she didn't tell them everything. In fact, if you look at the biannual report and you take her testimony, juxtapose them both, the biannual explicitly references whiplash, knee surgery. I'm sorry, let me ask you this. Did she tell them about visiting Dr. Smigel? Yes, she did. And that's in the record. She told me. Where would I find that in the record? It indicates on the biannual that it says, and I quote, that she is currently under the care of a doctor. It doesn't list Smigel by name. Okay, but she didn't tell them anything about the visit to Dr. Smigel. Did she tell them that she was concerned she would drop her shears and she couldn't engage in these kinds of repetitive motions? And if so, where can I find that in the record? She did. And in fact, even before she goes to Smigel, she makes those same exact complaints to the shipboard doctor. Okay, where can I find that in the record? It is the shipboard records, which I'll identify. It's at the app 98-125. And it shows what she reported to Smigel is almost verbatim what she reported to the shipboard doctor before she went to see Smigel. Verbatim. And critically, Mandarin never called the shipboard doctor that she saw after seeing Smigel to suggest that she ever reported anything contrary. It defies any level of reason that she reported in prior to going off the ship to see Smigel, but didn't after. And even if she didn't, the doctor after on the ship has all the records from before. The bottom line here is the judge misanalyzed the first McCorpin test relative to the 2013 PME and didn't utilize at all the second test. And I would submit most respectfully that we could disagree here among ourselves what the results of that proper test would have been. But the trier of fact, i.e. his honor below, didn't apply it. So it is profoundly unfair in Warren's reversal for Ms. Sarah Beth insofar as that was never determined by below. Your honor, Judge Rosenbaum, at bottom, your interpretation could be flatly correct. I would respectfully disagree with it, but it was never tried or at least never applied by his honor. And I'll just say lastly, as it relates to the 2013 conditions and to your honor Judge Wilson's question about credibility, the reason I said it's a yes and no is because his honor failed utterly to apply the Vaughn rule to any of the medical legal questions. And he was obligated to when there's any ambiguity to what the medical conditions from which Sarah Beth suffered was under the Vaughn rule, his honor isn't allowed to make a credibility decision as he did and say, I agree with the expert hired by Mandera. And I'm discounting the half a dozen other doctors who say to the contrary, that by rule, those other doctors have to be given the credibility win. Thank you, Mr. Brill. I'll reserve the rest, please. Good morning. Good morning, your honors. May it please the court, Aleda Milke on behalf of Mandera Spa. Just to kind of take the points backwards, talking about the standard of review and whether the Vaughn test applies, Mr. Brill and the appellant in this case would have the court apply a Vaughn test, which basically gives deference to what the claimant claims below. When we look at the Vaughn case and we address the case that it's premised upon, which is Aguilar and Warren, in those cases, there was a question, a very narrow question, as to whether or not a seaman who leaves the ship with permission of the ship owner that's not on duty and not at the service of the ship and gets injured, whether that injury is covered under maintenance and cure. That case went to the Supreme Court under conflict between the second and third circuits, where in one circuit they found he's not entitled to maintenance and cure. And in another circuit, they found that he was entitled to maintenance and cure. And the nitpick, and we're going to give the benefit of the doubt to the seaman in this context, because if the seaman had been on board and had been injured, even though he was idle, he still would have been entitled to maintenance and cure. So the context of the statement that Mr. Brill wants to rely on is not in the context of a McCorpin defense, where the burden is already on the defendant to prove the burden of proof. The context of that statement and the Vaughn test is in the context of we're not going to nitpick against the seaman under these circumstances. And then that holding was extrapolated forward to address nitpicking to the extent or discrepancies to the extent of other issues outside of McCorpin. Going to the McCorpin defense in this case, the court, the district court below very correctly applied both the objective test and the subjective test in determining that Miss Whitbard had a serious debilitating longstanding history that she did not disclose concealed misrepresented to the employer in a form provided by the employer specifically for that purpose. That the information that was concealed or misrepresented was material to the employer in making the decision to hire Miss Whitbard and that there was a causal connection between the concealed or misrepresented information and the lawsuit. In this case, we have a longstanding history that Miss Whitbard had neck complaints, radiculopathy, paresthesias, which is numbness, tingling in the extremities dating back to 2011. So much so that at the age of 22 or 23, she's getting an MRI to determine whether or not she has multiple sclerosis. Now, that MRI showed a disc bulge at C5, C6. It was an abnormal study. And it wasn't just the defense experts who said that. Dr. Young, who is Miss Whitbard's treating physician, who treated her after she debarked in 2017, was also retained by the appellant to look at the prior films. And Dr. Young looked at the 2011 film and said, I can see here at C5, C6, C6, and C7, evidence of degeneration, bulging, pathology. That's long before she ever does her 2013 PEME. Now her 2013 PEME is done at the direction of Mandra as a precondition to her employment. Mandra testified by virtue of Elizabeth Munko, who was the director of claims at the time, and who indicated that every single employee, all 3,000 of the employees that Mandra employs has to have this PEME. It is an absolute prerequisite to employment. And it is materially relied upon by Mandra as a condition for employment. The PEMA is completed by the doctor, not by the prospective employee, right? Well, actually, Your Honor, that's not entirely correct. The 2013 PEME is a nine-page document. In that nine-page document, the focus primarily in trial was to build a questionnaire as to the information. And then the physician is supposed to fill in any information that is incorrect or missing. And it's the applicant who attests in writing under penalty of perjury that the information is correct. So the argument advanced by appellant that Dr. Coulter was the one who filled out the form and that Ms. Whitbart can't be held to know what was on there, either because of her dyslexia, really doesn't have any bearing in this case. What do you have to say about Mr. Burrell's argument that the judge here, the district judge, applied the wrong McCormick test? I would point the court to the appendix and the court's findings of fact and conclusions of law, where the court said, applied the subjective standard to the 2015 PEME. It's particularly to the visit to Dr. Schmingel. And he said that there was no reasonable basis for Ms. Whitbart to make the determination that she was fit for duty, because there's no evidence that Dr. Coulter was ever asked to determine her fit for duty. There was no evidence that Dr. Schmingel was asked to determine her fit for duty. And as Judge Rosenbaum pointed out, she was not getting correct information to the shipboard physician such that he could make an accurate assessment. The court determined, the court stated, Ms. Whitbart demonstrated that she knew this information was important to her ability to do her job, which under the most subjective standard, would have been of import to her employer. I'm sorry, just one question about that. Your friend on the other side said that the reason that she didn't disclose this was because she was given physical exercises to do in between clients, I guess. And so she thought that her condition wasn't incapacitating. I guess I'd like to hear your response to that. Well, I think that there's a difference between a determination of fitness for duty in the context of a maritime case and in the context of what that means to somebody aboard a ship. There's absolutely no evidence in this case, none elicited by the appellant, that Ms. Dr. Schmingel was in any way aware that she was being asked to make any kind of determination about fitness for duty, and that any of the exercises that she was provided, that she provided, indicated an implicit knowledge that there was an option not to exercise. Exercising in between clients doesn't address the question of whether she would have been fit for duty in the context of somebody who knows what that means for a ship owner. Dr. Schmingel, there's no evidence that she was asked to make that determination, and there's no evidence to suggest that in providing exercise, she knew the context under which fit for duty would be applicable to a ship owner. With regard to the question that I think your Honor asked, Judge Rosenbaum asked Mr. Breaux, was the shipboard doctor wasn't being told the totality of the circumstances. So he was finding her fit for duty in the extent that he continued to let her work before the 2017 MRI. So right up until the 2017 MRI, the physician, based on the symptomatology that he was being told, was letting her work, and then referred her for an MRI. The 2017 MRI, when it gets back, the shipboard doctor says, no more, you are not fit for duty. And what do we find on that 2017 MRI? The same exact conditions that were there in the Sorry to interrupt, but let me just ask you a question. Also, opposing counsel said that if we that in the record that we will find that she told the shipboard doctor that she was dropping shears and that she wasn't able to really, she was concerned that she wasn't able to her job. Is that in the record? Would you agree that that's in the record? Anywhere, actually. Your Honor, I have to say when Mr. Breaux said and pointed to a specific page, I kind of was tempted to run around and find it because I have scoured these records and I do not recall anywhere else that she says that she drops her shears. What I do recall is that in a subsequent physical did her 2015 PEME, which was done in August, that she indicated to the physical therapist, I can hardly work. And that definitely was not told to anybody except for in that form. Nowhere else is there anywhere that I saw in this record that Ms. Whitbard told anybody with authority to determine her fit for duty that she was afraid she would drop her shears. And I think that that. But does the shipboard doctor receive copies of any documents from the physical therapist, though? No, no. So in this case, what's interesting is specifically about this case is Ms. Whitbard, considering that this was her first contract still with Mandra, when she gets off at Hilo through her own private insurance, makes the appointment with Dr. Smeagol, does her MRI and finds out everything that she does as is reflected in the record, more importantly, gives the history that she gave, which connects her conditions to her job, her knowledge of her inability to do her job and predates it all the way back to 2011 when she had pain and MRIs and CTs. So she in this one document is connecting the past and the present and shows her subjective knowledge and shows that she does have the ability to relay her history accurately when it benefits her, which she didn't do ever in her 23 PME or in her 2015 PME. So when you consider that she did all of this without informing anyone at Mandra, and then she takes her MRI, which she had with her, and gets back on board the ship, and even with the documents in hand, doesn't tell anybody at Mandra or on the ship, even though her contract requires her to update her medical information. And even though the 2015 PME, which is done only months later, asks specifically for that kind of information. So then she goes to see her hometown doctor, Dr. Coulter, in May of 2015. And at that point, she goes specifically to Dr. Coulter to review that MRI. And Dr. Coulter testified that when he looked at the MRI, he saw that there was a ruptured disc at C5, C6, and he told her that. And Dr. Raj, who is our defense expert, testified that it would have been below the standard of care for Dr. Coulter not to have told her that, given that she was coming specifically to discuss it. And she got back on that ship, and she did her 2015 PME, knowing, having been told that she had a ruptured disc, and it doesn't appear anywhere. So there is a subjective concealment. There's a knowledge that her conditions, the symptomatology, and the frank findings on MRI are affecting her job, and she never told us about it. And then she wants to claim maintenance and cure, payments for surgeries on issues that she was obligated to disclose to us, and which we would have not hired her. We would not have renewed her for her subsequent contracts if we had known that she had a ruptured disc in 2015. We wouldn't have hired her in 2013, as Ms. Mungo testified, if we had known about the history of cervical spine degenerative disease, the MRI, the abnormalities, the paresthesias, the headaches. And she's going to be hired to somebody who has that kind of history. So in this case, she was ultimately debarked because of the MRI. She underwent surgery at C5, C6, and C6, C7. And those are the very same areas that she had pre-existing conditions evident from 2011 that progressed throughout her lifetime, and that were predated our employment, which she failed to reveal in the 2013 document that was and under the subjective standard also failed to reveal it in the 2015 when she knew, and there's ample evidence of it, that it could have affected her work and her employer would have wanted to know about it. The court below was absolutely correct in finding that we met every prong of the McCorpin defense, subjective or objective, and we ask this court to please affirm. Thank you, Ms. Milkey. Mr. Brill, you have reserved some time for rebuttal. Thank you. First, let me clarify. I did not, and if it came off that I said this, say that the November 2014 ship record explicitly references the fear of dropping tools. What I said and what we briefed explicitly on page 21 of our brief, that was that Sarah Beth's complaints to Marquis, or Medicly Smigel, were consistent with Sarah Beth had told Simeno, that's the shipboard doctor, on November 2014 shipboard visit, that about two months earlier she had started experiencing right arm stiffness, swelling, pain, numbness, and left neck and shoulder pain, and there also indicates traction and that kind of thing. That is mirrored exactly with the exception of dropping tools. Don't you think that the part about dropping tools is kind of important? I mean, I don't dispute that, of course, of course. When you're working on board the ship as a, as she was, of course, but again, and respectfully, I think, I mean, if you've got a cosmetologist on board who was dropping shears on her clients, that is a liability issue for, without a doubt, without a doubt, but my point again is firstly that it, she is telling these things largely to Simeno. She reports back, and this is in the record too, where she says, I went on the ship, I worked for a while, and they told me to go down to medical in the middle of my contract medical exam, and I told the ship doctor that I had physical therapy, an MRI, and my doctor on land said I was fit for duty. That's the truth. Now, we may all say she should have or maybe could have told about dropping of the shears and didn't, but the fundamental point is this, that goes to prong one of the correct test that should have but wasn't deployed, which is the failure to disclose defense, and even if she should have and didn't disclose that fundamental fact, she still has a reasonable and subjective belief she is fit for duty because everyone is knew about the dropping of the, the fear of dropping of the tools and said she was fit for duty, and contrary to my able adversary's contentions, both below and here again today, nowhere in the record, let alone in that judgment, is it clear, in fact, to the contrary, it's clear, in fact, the judge didn't apply the correct test. The argument that counsel made moments ago saying that the judge did apply an objective and subjective assessment, sure, but that was a as to prong two of the failure to conceal defense, which is whether it was material, and no one's disputing that under that test, these things are material. Bottom line is his honor did not and should have applied the failure to disclose defense to that PME, and while I recognize and fully appreciate your honor, especially Judge Rosenbaum's trepidation, why we would allow maintenance and cure to be made for someone who didn't, at least according to the defense disclose that discrete critical fact, maintenance and cure is as an ages old doctrine is not to be refused, except under these specific conditions, and that prong to for the again, there is no way any of us, anybody, anybody could look at the repeated findings by all of these doctors, including moments before the receipt of the 2017 MRI results, that Sarah Beth was unreasonable in thinking that she was fit for duty, and that was the job of the trial court below. I would then just to respond to just a few other things. To your honor, Judge Wilson's point, it is absolutely a critical factual and legal concern that Dr. Coulter filled out that 2013 PME, whether the intended purpose of the form to Ms. Mielke's comment was that Sarah Beth should fill out parts of the form, because of her dyslexia, she didn't. So under the law, yes, she should not be held and cannot be held liable for failing to disclose something, particularly when Dr. Coulter filled out the form, and he's the one that said, I read it wrong. And to that point, she had, and it is not abnormal to say you have the form under penalty of perjury. She did, sure. But she's told what's on the form verbally by Coulter, both what the form intends to say, and what it in fact says. And to that point, everything on there was accurate. And when you, again, go to the third prong of the concealment test, which goes to that 2013 PME, and the only pre-employment medical exam we're talking about here, there can be no connection to what is shown on that, the MRI from 2013, and CT from 2011, and what's there in 2017. 2017 is a mess. Every cervical level from C3 to C7 is affected. In 2013, she had a bulge, which is not an abnormal finding. We all have them at one level, and not the level that was even operated on in 2017. So I could quote at length, Your Honor, part of the panel that decided the Jackson case, there is no way to correlate the findings from 2013 to those when she was medically disembarked, because the levels aren't even the same. And in fact, she doesn't have pathology at any of those cervical levels. And if the court would just indulge me to just note one last key point is, again, this is despite the legitimate concerns that Sarabeth in expressing to Dr. Smigel on land, an appointment, not incidentally, which she was urged to make by the shipboard doctor, that when she makes it, that's 2015. She's hired on consecutive contracts, 15, 16, 17. So the suggestion that it's unreasonable for her to believe she's fit for duty then, when she's working all the way to January 2017. That again, is belied by the actual evidence. So at bottom, I would respectfully suggest that it's abundantly clear that His Honor applied incorrectly the correct test to that PEME, but misapplied the entirely wrong test to the 2015 examination. And for those and all the other reasons we briefed, I would urge that we it would be afforded at least a new trial. All right. Thank you, Mr. Brill. And Ms. Mielke, we have your arguments. And that completes our docket for this morning. The court will be in recess until nine o'clock tomorrow morning. Thank you all very much and please stay safe. Bye, Ms. Mielke. Bye. Bye, David.